Good morning, may it please the Court, Phil Talmadge and Aaron Orheim here representing the appellate mobile home park owners. Mr. Orheim is an intern in our office and this is his first Ninth Circuit argument. Tumwater enacted ordinances that constitute a thinly disguised ban on the closure of mobile home parks within that community. Tumwater City Council did so with an animus toward the mobile home park owners and with the idea of currying favor, political favor, with mobile home park tenants. As such, Tumwater took the park owner's property under state and federal takings law because the regulation of the owner's property went too far or the ordinances constitute a violation of the owner's state substantive due process rights because the means employed in these ordinances are arbitrary and unduly oppressive to the property interests of the mobile home park owners. Counsel, you're bringing a facial challenge, correct? Correct, Your Honor. And can a facial challenge be made under Penn Central? I believe it can, Your Honor. I think the court in Guggenheim left open the issue of whether such a facial challenge was appropriate. Certainly a facial challenge is appropriate under Washington state takings law, mobile home communities of Washington versus state, and that kind of facial challenge is also appropriate under Washington state law with respect to the substantive due process argument. So we don't believe that there's an inhibition, and I don't believe there's any Ninth Circuit authority that suggests that a facial challenge under the Penn Central analysis would be foreclosed. Here, in either instance, whether we talk about it in terms of a taking or whether we talk about it in terms of a substantive due process violation, Tumwater's decision to ban the park closures in the guise of preserving low-income housing basically imposed the burden of a general social policy on the backs of essentially six property owners within the city of Tumwater. We have no multi-family housing zone that forecloses the type of activities that we're talking about here. We have no single-family housing zone that forecloses the type of activities that would have formerly been available to the park owners in this context. And let me be precise about why I say that. Under the former zoning, the mobile home parks were a conforming use in the city of Tumwater. If they were not mobile home parks, they could be used for single-family housing development, multi-family housing development, and potentially other uses. Counsel, the ordinances still allow several uses outright and almost a dozen uses conditionally. So it's not really an all-or-nothing proposition. It's a gradation or a continuum. How do we decide where on the continuum you are, where in this case there's essentially no evidence of financial impairment of present value? Well, I would disagree with the statement, Your Honor, about the existence of economic impact evidence. There is economic impact evidence that I'll speak to in a moment. But the court does need to look at that gradation that you're talking about here. You look at the ordinance and look at these so-called uses that are available outrightly permitted uses, accessory uses, or conditional uses. And if you cut through those uses, they are not economic. Let's take, for example, the possibility as one of the uses that you can put a single-family house on a lot owned by a mobile home park. That's one house, a single house for the entirety of the mobile home park. Not a very economic use. Community centers, daycare facilities, trails, cemeteries, churches, not very economic uses. Well, daycare could be, recreation could be that economic. It's conceivable. But compared to a multi-pad mobile home park, it's not a very significant economic use. Plus it requires the approval and the necessary licensure and so forth for the establishment of that use. The bottom line is, in effect, unlike the circumstances that existed before where the mobile home park owners could, at a minimum, develop the property as single-family housing or develop the property as multi-family housing, you can't do that. What is the effect on our analysis of the sort of what I would call the safety valve or the catch-all, which says that it's possible for the city council to approve a request for an exception if, among other things, the authorized uses are not economically viable. So, in other words, there's an escape hatch. There is an out that is right in the ordinance. So what effect does that have? The so-called use exception, Your Honor. Our argument is that the so-called use exception is essentially a requirement that there be a rezone and that it's a pretext. I don't understand that, what you mean by rezone. It says you can apply for an exception and do something else if you can prove that none of the existing things is economical. And that was the conversation that was had when the use exception was discussed before the city council. It was essentially a rezone concept. Well, I guess I'm finding that labeling unhelpful because it seems to me that the crux of your argument has to be that this ordinance removes economic use from your clients. They're now stuck with something that's worthless. But without regard to labeling this something, I guess I'm having difficulty seeing why an ordinance that specifically recognizes the possibility that there would be I'm not aware why that isn't a sufficient safety valve. The evidence suggests this, Your Honor. If you look to excerpt of record 1663, the cost of going through the process we're talking about to get this use exception applied would be about $2,000. It would take approximately two years to obtain. It would be up to an antagonistic city council, one of whom specifically said that it would be an extraordinary burden on the property owners to achieve the use exception to the ordinance. And that person isn't in office anymore as I understand it. I think it evidences the antagonism that existed on the council. What relevance is that kind of evidence when this is a facial challenge? Well, it goes certainly, Your Honor. Because we have to look at the ordinance period, not at who happened to be on the city council when it was enacted or who was elected later. Well, it goes to the substantive due process issue. It goes to whether the means utilized are reasonable. It certainly goes to the question of whether there's an oppressive, unduly oppressive imposition on the property owners. And the fact is that the council indicated it would be expensive to go through this process, that it would be questionable. That was the language of the one council member who was talking about it at excerpt of record 1660. And we note that we had practical evidence from Mr. Eichler, find this at excerpt of record 315, that any effort on his part to go through a process with the city of Tumwater to achieve any kind of necessary change with respect to uses at his park was extraordinarily difficult. So we have evidence of the fact that this use exception is difficult. The bottom line from our perspective is really twofold with respect to the takings issue. The first is the district court made a number of factual assumptions that are simply not supported. The first was the question about economic impact. There was evidence in the record that demonstrated from Tumwater's own expert that there was quantitative evidence that there was a diminution in the value of the Velcomen Park simply because of the enactment of the ordinance. How much was that? That was $300,000 at a minimum, Your Honor. That expert testified to the value as a development for single-family housing of $2.7 million, $2.4 million as a mobile home park. Ultimately, the property was sold for only $1.6. But their own expert demonstrated a quantitative loss from the enactment of the ordinance itself. There was testimony from Ms. Wilson, our expert, that there was a transfer of value, that there was a specific transfer of value from the park owners to the park tenants, that quantitative and qualitative evidence of economic impact was sufficient, in our view, to get past summary judgment. The other issue that the trial court, the district court, evaluated was the question of investor-backed expectations. We note that in this particular case, there was a reasonable alternative use to the mobile home parks prior to the enactment of this ordinance. There was no reasonable alternative use to the mobile home parks after its enactment. A cemetery is not the same as the opportunity to develop the property for purposes of multifamily housing or single-family housing. And all of this, I would point out, undercuts the whole contention that this ordinance was designed to preserve low-income housing. If that was true, then why wouldn't the ordinance have permitted the development of single-family low-income housing or multifamily low-income housing on these properties? That was foreclosed by the enactment of the ordinance. Well, we've often said, and many courts have said, that there doesn't have to be a perfect fit between the legislative purpose and an enactment, that even if one can think of an even better ordinance or an even better statute to fulfill a purpose, it doesn't mean that this isn't for the purpose. So just saying, well, they could have done it better to write this ordinance to allow one more thing doesn't really suggest to me, at least, that it's unconstitutional officially. I think it demonstrates, Your Honor, the real impact of the ordinance. The ordinance and its two – the zoning ordinance and its initial two whereases speaks to closures of mobile home parts. This ordinance – Because that's existing lower-income housing. And to deal with existing lower-income housing in certain ways doesn't require that you deal in additional ways with low-income housing for it to be legitimate. I guess I just don't understand where that gets you. I think it gets us here, Your Honor, and that is the point that there's no reasonable alternative use to this property. It's essentially a freeze on the use of these properties. That takes us back where we started, that there are, you know, a dozen uses plus a clause saying, if those don't work, let us know. But those uses aren't real uses, Your Honor. They're not real economic uses. The use of a property as a cemetery or the use of property as an open space or as an accessory to the – Right, and you're leaving out the ones that might actually be economical. Well, such as – Recreational facilities would be quite economic if feasible. A neighborhood commercial center, which is 2,000 square feet minus 15% for landscaping, which leaves you a very tiny local mini mall or mini store, basically, as opposed to the use of a large mall home park. It's not the same kind of economic use. The bottom line here, though, is in addition to all of this, the district court did not analyze under the character of the government of the Penn Central test, the Armstrong analysis, about disparate impact on particular property owners. This policy of low-income housing preservation, as the city asserts it to exist, is imposed on six mobile home parks. Not all mobile home parks in Tumwater. They picked winners and losers. Not all housing in Tumwater, certainly not multifamily housing, not single-family housing. Six parcels. Those are the people that bear the burden of this public policy. And there is no analysis of that prong, as the Civic Legal Foundation pointed out and as we've pointed out in the district court order. Moreover, with respect to the state-taking issue, the district court didn't even address it. There is no addressing of the issue at all. And the city asks you, for the first time in the case, to basically analyze the state-taking issue that we've raised. But isn't that an issue of law that we can analyze? It is an issue of law, Your Honor, that you could analyze, but we've asked the court to certify the issue to the Washington Supreme Court. The city has argued that the Washington state-taking law is the same as federal law. That's untrue if you read MHCW, the decision of the Washington Supreme Court. Well, we can read the existing Washington law, and we do regularly. I understand that, Your Honor. But they also argue that Washington state law is so unintelligible, such a quagmire. We don't have to agree with that, do we? I agree with you, Your Honor. So if we don't find it an unapproachable quagmire, shouldn't we just decide that issue? We're happy to have the court do it, and I think the key controlling case is MHCW. It is dead on in this case. We argue that it's the controlling authority in this case, and under the provisions of that decision, which forecloses the taking of property by government to give to another private entity, unlike the United States Supreme Court decision in Kelo, you can't do that kind of thing. Counsel, did you want to save a minute for rebuttal? I do, Your Honor. The one last point I would make is we have, I think, controlling Washington state authority with an additional prong for the substantive due process test, unduly oppressive on a landowner. We believe that Guimont, Sintra, and the Mission Springs case are very clear and are controlling and demonstrate that the district court's decision on the state substantive due process analysis was erroneous and should be reversed. Thank you. Thank you. Good morning. Good morning. My name is Jeff Myers. I represent the city of Tumwater. With me today is Karen Kirkpatrick, the city attorney. This case involves a zoning ordinance, which rezoned six existing mobile home parks to continue to operate as a permitted use as mobile home parks. The appellant is asking you to hold that an ordinance zoning property to permit its existing profitable use constitutes an unconstitutional taking and a violation of substantive due process. Well, opposing counsel's position is that the owners of the mobile home park are being asked to shoulder the responsibility to provide affordable housing in the city. The purpose of this ordinance was to preserve a variety of housing types and specifically to promote this type of housing, which is a more affordable type of housing, and to give that opportunity in the marketplace for people of lower incomes. That's a mandate of the State Growth Management Act to provide that variety of housing types. So that's what the ordinance was aimed at accomplishing by ensuring that this type of housing would be available within the city of Tumwater. But the argument is that why should that burden fall solely on manufactured housing owners as opposed to being distributed throughout the zoning code to all parts of the city? The first thing is that that is relying on the Armstrong versus United States case in which the goal of the takings test is generally equated with not asking individuals to shoulder a societal burden. That is not the takings test itself. That's just an overriding goal. But in this case, there's no basis in the record to believe that the city is forcing only manufactured home parks to shoulder the burden of affordable housing. There's unrebutted declarations from the city planning director, Mr. Matlock, which describe how the city has other types of affordable housing, multifamily zones, that it has small lot, single family zones, which are designed to be more affordable. But under the present zoning structure, the manufactured home owners cannot convert those parks into multifamily homes. Is that correct? That's correct, because this is a particular type of existing affordable single family homes, which the record shows throughout the decade prior were faced with closures which have a specific burden on tenants. And that burden is probably best described in Justice Talmadge's dissent in the manufactured housing case, in which he describes how onerous it is to force closure on these people. And a lot of the cases that are cited to you are cases where legislative bodies have tried to respond to the burdens that are created by closures of mobile home parks. The Garneau case, for example, is one that dealt with a fee that is imposed to help relocate tenants who are displaced by closures of mobile home parks. And that was held not to be a taking. But why isn't that depriving the owners of the highest and best use of their property? It's not depriving them of the highest and best use of the property, because the appraisal analysis by both the city's appraiser and by Ms. Wilson, the appraiser for the properties is to operate as a mobile home park. The six that were chosen are basically located in residential areas. There were several properties which are really not mobile home parks. They're just simply large parcels where there's one mobile home over here, there's another mobile home over there. They weren't formally subdivided. So technically they could be considered within the state economically as a mobile home park. It's just one property owner. The critical one, I think, that you want to look at is the Alamore Park, which unlike the ones that are located in residential areas, is located in the heart of the city's commercial core. It's got Costco and Fred Meyer across the street. It's surrounded by commercial uses. There's a shopping center right next to it. So because of that, it is different than all the others. But why does that make it any less important to the goal of providing affordable housing? Well, the city council had to balance the question of whether or not enough property is provided, and it has to make that call as a legislative matter to determine which ones are or are not providing sufficient affordable housing and sufficient area for manufactured home parks. The Alamore Park being located in this is a much less desirable community because it's surrounded by commercial business as opposed to having the residential setting that all the plaintiff's parks share in common. Counsel, I also found the most difficult part of this case for me being this so-called spot zoning argument that Judge Rawlinson is asking you about. But again, I have the question, can a spot zoning argument be raised in the form of a facial challenge to an ordinance, or does it require the kind of factual development that turns it into an as-applied challenge? Well, the test for spot zoning from the state Save Our Resources case, the SOAR case, first of all turns on whether it's consistent with the comprehensive plan. And the comprehensive plan designates the area where the Alamore Park is to be the commercial core of the city. That isn't actually my question. My question is a procedural question. Procedurally. Can it be brought as a facial challenge? I haven't seen any cases that hold that you can bring a facial challenge without looking at specific evidence. What's the answer? I haven't seen any authority that allows a facial challenge. That's not the other way either. Have you seen any cases that say you cannot? I haven't seen any cases dealing with that specifically in a spot zoning context. I have seen cases where summary judgment was granted, as in this particular case, because they looked as a matter of law to see whether or not it meets the tests that the SOAR case sets forth, consistency with the comprehensive plan being paramount. Which would be a kind of facial challenge. So it sounds like maybe it is appropriate under Washington law to do that. Perhaps it would be. And in this particular case, the issue of consistency with the comprehensive plan was raised in parallel state litigation before the Growth Management Hearings Board, before the Thurston County Superior Court, which found that these regulations were consistent with the comprehensive plan. And therefore, that issue, I believe, is collaterally stopped. And the issue of consistency with the comprehensive plan is established. And we argued that in our briefs. I want to make a couple of points about this case. It's a facial case. And if you look at the State cases and the Federal cases, in order to show a facial taking, the requirement is that the mere enactment has to amount to a taking. And that the facial taking requires all economically viable use be taken. That's the court's holding in the DeBenedictus case and is quoted in the Presbytery and Guimont cases. They have an incredibly uphill battle as a facial takings case because of that element. Especially so because the use exception specifically recognizes if you get to the point where there is not an economically viable use as a manufactured home park, the zoning reverts to its prior zone. That is based on a factual showing that there is no longer a reasonable use or that it's no longer economically viable to operate the mobile home park. That's different than a rezone. And the quote that Council Member Valenzuela is attributed with had to do with the possibility of a future rezone, not the application of the use exception. Because the use exception wasn't part of the draft ordinance at the time she was asked that question. So that's an important point to consider. If you look at the – I have one other question. At least in the briefing, there's a great deal made out of the allegation that there was personal animus against mobile home parks or against these particular mobile home parks. In determining that, where does a political position and personal animus begin? In other words, someone is entitled to have a strongly held and even fanatical political position and legislate from that viewpoint. And I wonder how we distinguish those things. I don't think that personal animus is relevant at all to takings analysis. And as a facial takings challenge, that would not be relevant at all. I don't really believe it's relevant to a facial challenge at all. It's at most relevant where there are some sort of classification. Let me see if I understand your position. Your position is the ordinance is whatever it says on the piece of paper. And the reasons behind it, other than those that are stated as legislative findings, are irrelevant to a facial challenge in your view. The specific statements of an individual city council member cannot be used to establish the intent of the body as a whole. Because one member wants to make a statement that he sympathizes with the concerns of the public and recognizes that that problem may be created by those who are regulated, shouldn't be surprising in any sort of legislative action to address a public problem like the impacts of closures of mobile home parks. So that's how I would address that. Can I ask you, what is the population of Tumwater? I believe it's about 16,000. And what's the population of these particular? I don't believe that the population of these particular mobile home parks is in the record. The Tumwater Estates, I believe, is the largest of these and has 110 single-family mobile homes. I want to also, in addition to addressing the facial nature of this claim, address the Penn Central test. Because both the state analysis and the facial claim that is being presented here purport to make a facial Penn Central test. In answer to your question, I don't believe the Penn Central test was ever intended to be a facial analysis. It's described as an ad hoc factual analysis, which lends itself to an as-applied challenge. But like the Guggenheim case, we've assumed that you can make a facial Penn Central test. If you do that, it doesn't pass muster as a taking to rezone an existing profitable use as the permitted use in this zone. And you look to the three factors, the economic impact. The evidence here is that there was no economic impact. Two of the three mobile home parks, the before and after appraisals came up no impact because the highest and best use continues to be as a mobile home park. The third park, the Valcomen Park, before there were offers of $1.75 million and $1.6 million, they fell apart largely because the water system wasn't included. After the ordinance was adopted, it was sold for that same $1.6 million price. So there is no impact. And that was after the housing bubble burst. So there is no evidence of substantial impact. And even if you consider that one of the three parks might have had a small impact based on the appraisal that Mr. Talmadge cited to you, that is a minimal impact that is fact-specific and is not a facial impact. It would be fact-specific solely to the Valcomen Park, not to the others that are regulated. What they're really trying to do here is shoehorn this case into the facts of the Guggenheim case that were alleged in the panel opinion that this court reversed in its in-bank decision. They're trying to find some sort of economic transfer, but there's no evidence of that because this isn't a rent control case. There's no mechanism to capitalize the savings that are attributable to future rents and transfer that to the sale price of the mobile homes. There's no evidence that that occurred. And when I took the deposition of their expert and asked her to explain what this was and to quantify it, she couldn't answer the question. She couldn't identify how much it was, what it was, and how you could determine it. And she further couldn't even identify what stick it was in the bundle of sticks that was being taken. So that's why this is not a taking. Counsel, you've used your time, but if you want to wrap up in a couple of sentences, you may do so. This is not a taking under either the state or the federal analysis. And in the district court's opinion, the district court dismissed all the remaining claims because they were derivative of the analysis that the district court went through. That's correct and shows that the district court actually intended to dismiss the state taking's claim because if you do that analysis, Presbyterian and Guimont are the controlling cases, and they point you to this state test that ends in the Penn Central analysis. And if you do the Penn Central analysis, it's not a taking. So under either test, the district court's decision should be affirmed. Okay. Thank you. Mr. Talmadge, we'll give you one minute. Thank you, Your Honor. Just a couple of points very quickly. First, just a reminder that the district court did not address the Washington State takings issue at all, nor did it go through the analysis of the government character prong of Penn Central that does speak to the Armstrong issue. It did not even address those in any way, shape, and form. For counsel to stand up here and say that this ordinance has something to do with other forms of housing in the city of Tumwater is simply and utterly false. The ordinance deals solely and exclusively with mobile home parks. There's not a jot of discussion in this ordinance about any other type of housing other than mobile home parks. And for him to suggest that, oh, this is something to do with low-income housing generally in the city of Tumwater is simply incorrect. With respect to the as-applied versus facial issue, the Washington Supreme Court, at least with respect to the Washington State takings issue, dealt with that as an as-applied issue. So it was addressed there as a facial challenge, not as an as-applied challenge. So the court did seem to see that that was something that could be addressed in the context of a facial challenge. With respect to the political animus issue, Batterson and the Mission Springs decision both speak to animus on the part of the political decision-makers. In those jurisdictions, the activity of the city council was contrary to the advice of the city attorney, and there was expression of animus toward the property owners. You have the same thing here with the addition of the fact that this ordinance was developed contrary to the advice given to the city of Tumwater by the Municipal Research Center of the State of Washington, a nonpartisan organization that provides advice to municipalities, and contrary to the advice of the city attorney. We have evidence in the record and excerpts of the evidence. We have exceeded the time allotted, so I think we have a handle on the record and on the briefing and the issues that have been raised. Thank you, Your Honor. Thank you. We appreciate very much the arguments of both counsel in this very interesting and challenging case. The case is submitted. Our next case on the argument calendar is Chesbrough v. Best Buy.
judges: Noonan, Graber, Rawlinson